**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATALIA LA ROSA, and PHOEBE CANEDA, on behalf of themselves and all others similarly situated, | Case No.  1:22-cv-5435 |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| ABBOTT LABORATORIES, ALERE, PROCTER & GAMBLE MANUFACTURING COMPANY, SPD SWISS PRECISION DIAGNOSTICS GMBH, CHURCH & DWIGHT CO. INC., TARGET CORPORATION, CVS PHARMACY, INC., and WALGREEN CO., | |
| Defendants. | |

Plaintiffs Natalia La Rosa ("Plaintiff La Rosa") and Phoebe Caneda ("Plaintiff Caneda") (collectively "Plaintiffs"), by and through their undersigned attorneys, bring this class action complaint on behalf of themselves and all others similarly situated (the "Class"), alleging facts related to their own purchases based on personal knowledge and all other facts based upon the investigation of counsel.

## PRELIMINARY STATEMENT

1.      Defendants Abbott Laboratories ("Abbott"), Alere ("Alere"), Procter & Gamble Manufacturing Company ("Procter & Gamble"), SPD Swiss Precision Diagnostics GmBH ("SPD"), Church & Dwight Co., Inc. ("Church & Dwight"), Target Corporation ("Target"), Walgreen Co. ("Walgreens"), and CVS Pharmacy, Inc. ("CVS") (collectively, "Defendants") produce, market, label and sell various ovulation test kits ("Defendants Kits") in the state of New York and throughout the United States.

2.      Millions of people buy and rely upon Defendants' Kits for family planning purposes.  Defendants' Kits are misleadingly advertised as being able to tell women, with 99% or greater accuracy, when they will ovulate, and thus, when they are the most fertile and most likely to be able to become pregnant.

3.      However, Defendants' Kits do not test whether a woman is ovulating.  Instead, these products only test Luteinizing Hormone ("LH") levels.  LH is made by a person's pituitary gland and is present in varying levels for people of all genders.  LH levels generally rise quickly just before ovulation in women, but LH levels can spike at varying times in the menstrual cycle for a variety of other reasons unrelated to ovulation.  Defendants' Kits identify when a person has a spike in LH — not when ovulation will occur.

4.      Defendants intentionally mislabel their Kits as ovulation test kits.  Defendants

know that their Kits test LH and not ovulation, but marketing their products as "LH Test Kits," where LH may or may not predict ovulation, would be far less attractive to women seeking to get pregnant.  False promises such as these allow Defendants to capitalize on reproductive anxiety and reap massive profits well in excess of $5,000,000 million dollars per year from unwitting consumers.

5.      This action arises out of deceptive and otherwise improper business practices that Defendants engaged in with respect to the packaging of certain ovulation test kits, detailed below, which are packaged in boxes and regularly sold in major supermarkets, grocery stores, convenience stores, and pharmacies throughout the United States, as well as on Amazon and other online retailers.  Defendants have been unjustly enriched by the practices alleged herein.

<u>**JURISDICTION AND VENUE**</u>

6.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332(d). Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and (2) the named Plaintiffs and Defendants are citizens of different states. 28 U.S.C. §1332(d)(2)(A).

7.      Venue is proper in this district pursuant to 28 U.S.C § 1391(a) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and Defendants are subject to personal jurisdiction in this district.  Defendants marketed and sold the products at issue in this action within this judicial district and do business within this judicial district.

## PARTIES

### A.    Plaintiffs

8.      Plaintiff La Rosa is a citizen of the state of New York and at all relevant times, has resided in Queens County.

9.      Between April 2021 and November 2021, Plaintiff La Rosa purchased, for her own use, Procter & Gamble's, Abbott's, Alere's, and SPD's (collectively, the "Clearblue Defendants") ovulation test kits marketed and sold under their brand name Clearblue, in Queens County, New York.  Plaintiff La Rosa reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of the Clearblue Defendants' deceptive packaging, Plaintiff La Rosa was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff La Rosa expects to continue to purchase the Clearblue Defendants' ovulation test kits in the future.

10.      Between April 2021 and November 2021, Plaintiff La Rosa purchased, for her own use, Church & Dwight's ovulation test kits, marketed and sold under its brand name First Response, in Queens County, New York.  Plaintiff La Rosa reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Church & Dwight Co.'s deceptive packaging, Plaintiff La Rosa was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses. Plaintiff La Rosa expects to continue to purchase Church & Dwight's ovulation test kits in the future.

11.      Between April 2021 and November 2021, Plaintiff La Rosa purchased, for her own

use, Target's ovulation test kits, marketed and sold under its trademark up & up, in Queens County, New York.  Plaintiff La Rosa reasonably expected that these products would test, with an accuracy of 99%, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Target's deceptive packaging, Plaintiff La Rosa was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff La Rosa expects to continue to purchase Target's ovulation test kits in the future.

12.     Between April 2021 and January 2022, Plaintiff La Rosa purchased, for her own use, Walgreens ovulation test kits in Queens County, New York.  Plaintiff La Rosa reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-48 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Walgreens's deceptive packaging, Plaintiff La Rosa was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses. Plaintiff La Rosa expects to continue to purchase Walgreens' ovulation test kits in the future.

13.     Between April 2021 and November 2021, Plaintiff La Rosa purchased, for her own use, CVS ovulation test kits in Queens County, New York.  Plaintiff La Rosa reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of CVS's deceptive packaging, Plaintiff La Rosa was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff La Rosa expects to continue to purchase CVS's ovulation test kits in the future.

14.     Plaintiff Caneda is a citizen of the state of New York and at all relevant times, has resided in Queens County.

15.     Between late 2018 and 2020, Plaintiff Caneda purchased, for her own use, the Clearblue Defendants' ovulation test kits that were marketed and sold under their brand name Clearblue, through Amazon.com, which shipped the products to Plaintiff Caneda at her residence in Queens County, New York.  Plaintiff Caneda reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of the Clearblue Defendants' deceptive packaging, Plaintiff Caneda was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff Caneda expects to continue to purchase the Clearblue Defendants' ovulation test kits in the future.

16.     Between late 2018 and 2020, Plaintiff Caneda purchased, for her own use, Church & Dwight's ovulation test kits, marketed and sold under its brand name First Response, in Queens County, New York.  Plaintiff Caneda reasonably expected that these products would test, with over 99% accuracy, whether she would ovulate in the next 24-36 hours, and not merely whether she was having an LH surge that may or may not be connected to ovulation.  As a result of Church & Dwight's deceptive packaging, Plaintiff Caneda was overcharged, did not receive the benefit of the bargain, and/or suffered out-of-pocket losses.  Plaintiff Caneda expects to continue to purchase the Church & Dwight's ovulation test kits in the future.

**B.**     **Defendants**

17.     Defendant Abbott Laboratories ("Abbott") is an entity organized under the laws of Illinois and is headquartered at 100 Abbott Park Road, Abbott Park, IL 60064.  Defendant Abbott is the parent company and owner of defendant Alere.  Alere and Procter & Gamble are co-owners of SPD Swiss Precision Diagnostics GmbH, which owns Clearblue.  Abbott and Alere, through their subsidiaries and related entities, including Procter & Gamble, manufacture, package,

advertise, market, distribute, and/or sell ovulation test kit products in the United States using the brand name Clearblue.

18.     Defendant Procter & Gamble Manufacturing Company ("Procter & Gamble") is an entity organized under the laws of Ohio and is headquartered at One Procter & Gamble Plaza, Cincinnati, Ohio 45202.  Defendants Procter & Gamble and Alere are co-owners of SPD Swiss Precision Diagnostics GmBH, which owns Clearblue.  Procter & Gamble, through its subsidiaries and related entities, including Abbott and Alere, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name Clearblue.

19.     Defendant SPD Swiss Precision Diagnostics GmBH ("SPD") is an entity organized under the laws of Switzerland and is headquartered at 47 route de Saint Georges, 1213 Petit-Lancy, Geneva, Switzerland.  SPD is co-owned by Procter & Gamble and Alere.  SPD, through its subsidiaries and related entities, including Procter & Gamble, Alere, and Abbott, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name Clearblue.  Defendants Abbott, Alere, Procter & Gamble and SPD are collectively referred to as the "Clearblue Defendants."

20.     Defendant Church & Dwight Co., Inc. ("Church & Dwight") is an entity organized under the laws of Delaware and is headquartered at 500 Charles Ewing Blvd., Ewing NJ 08628. Church & Dwight, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using the brand name First Response.

21.     Defendant Target Corporation ("Target") is an entity organized under the laws of Minnesota and is headquartered at 1000 Nicollet Mall, Minneapolis, MN 55403.  Target, through

7

its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States using its trademark up & up.

22.    Defendant Walgreen Co. ("Walgreens") is an entity organized under the laws of Delaware and is headquartered at 200 Wilmot Road, Deerfield, Illinois 60015.  Walgreens Boots Alliance, Inc. is the parent company and owner of Walgreens, and trades on the public stock market under the ticker "WBA."  Walgreens, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States.

23.    Defendant CVS Pharmacy, Inc. ("CVS") is an entity organized under the laws of Rhode Island and is headquartered at 1 CVS Drive, Woonsocket, Rhode Island 02895.  CVS Pharmacy, Inc. is a subsidiary of CVS Health Corporation, an entity that is also organized under the laws of Rhode Island and headquartered at 1 CVS Drive, Woonsocket, Rhode Island, 02895. CVS Health Corporation trades on the New York Stock Exchange.  CVS, through its subsidiaries and related entities, manufactures, packages, advertises, markets, distributes, and/or sells ovulation test kit products in the United States.

## FACTUAL ALLEGATIONS

24.    Defendants market and sell kits, which they misleadingly call "ovulation test kits," in rectangular boxes.  By indicating that their ovulation test kits have 99% or greater accuracy at testing for and predicting ovulation, Defendants deceive consumers.

25.    Since about 1989, Clearblue, which is owned by Defendants Abbott, Alere, Procter & Gamble, SPD, and their subsidiaries and related entities, has marketed and sold ovulation test kits ("Clearblue's Kits").  Clearblue proclaims that it developed the world's first one-step ovulation test kit.  During the relevant timeframe, the Clearblue Defendants marketed and sold at

least five different ovulation test kits: i) Easy Ovulation Kit, ii) Advanced Digital Ovulation Test, iii) Digital Ovulation Predictor Kit, iv) Trying for a Baby Advanced Ovulation Kit, and v) Easy Luteinizing Hormone (LH) Kit.  Each of Clearblue's Kits prominently bear the promise "99% Accurate" or "Over 99% Accurate" and are labeled as an "ovulation test" or ovulation kit." Clearblue's Kits also include such representations as "Identify your 2 Most Fertile Days."  For example, below is a photo of one of Clearblue's Kits[1]:



---

[1]     This image is representative of Clearblue's packaging at the time that Plaintiffs purchased their Clearblue Kits.  Around January 2022, the Clearblue Defendants changed the packaging of their ovulation test kits.

26.     Clearblue's website boasts that "over 20 million women choose to use Clearblue products every year."  Accordingly, the Clearblue Defendants make well in excess of $5,000,000 every year on their fertility-related products, including their ovulation test kits.

27.     Clearblue's Kits are regularly sold across the United States in various pharmacies and major retailers, such as CVS and Walgreens, and online through Amazon and other retailers.

28.     Since about 2011, Church & Dwight has marketed and sold ovulation test kits under the brand name First Response ("First Response's Kits").  During the relevant timeframe, Church & Dwight marketed and sold at least three ovulation test kits under its brand name First Response: i) First Response Ovulation Plus Pregnancy Test, ii) First Response Advanced Digital Ovulation Test, and iii) First Response Easy Read Ovulation Test.  Each of First Response's Kits prominently bear the promise "OVER 99% ACCURATE" and are labeled as an "ovulation test."  First Response's Kits also make such representations as "GET PREGNANT SOONER!" and "PREDICTS YOUR 2 MOST FERTILE DAYS."  For example, below is a photo of one of Church & Dwight's Kits:



29.     Church & Dwight claims that its home pregnancy and ovulation test kits, sold under its brand name First Response, are the number one selling brand in the United States.[2]  Church & Dwight's consumer products marketing efforts are focused principally on its 13 "power brands." Its First Response home pregnancy and ovulation test kits are included in its "power brands." Church & Dwight's consumer products segment comprises the majority of its revenue; for instance, in 2020, Church & Dwight's consumer products segment comprised about 77% of its

---

[2]     Church & Dwight's Form 10-K filed with the SEC for fiscal year ended December 31, 2020 at  p.  6  (https://www.sec.gov/ix?doc=/Archives/edgar/data/313927/000156459021006669/chd-10k_20201231.htm) (last visited on Mar. 30, 2022).

consolidated net sales.[3]  Each year, Church & Dwight makes well in excess of $5,000,000 in profits from sales of First Response's Kits.

30.    First Response's Kits are regularly sold across the United States in various pharmacies and major retailers, such as CVS and Walgreens, and online through Amazon and other retailers.

31.    Since at least 2009, Defendant Target has marketed and sold ovulation test kits under its trademark up & up ("Target's Kits").  During the relevant timeframe, Target marketed and sold at least two ovulation test kits under the up & up trademark, including the Ovulation + Pregnancy Test Combo Pack and Early Luteinizing Hormone ("LH") Test.  Each of Target's Kits prominently bear the promise "99% accurate" and are labeled as an "ovulation test."  Target's Kits also make representations such as "tells you the best 2 days to conceive."  For example, below is a photo of one of Target's Kits:

---

[3]    *Id.* at 39.



32.  Target's Kits are regularly sold at Target stores and through Target's website, target.com.  Target owns and operates approximately 2,000 stores in the United States.  There are 92 Target stores across the state of New York.  Defendant Target makes well in excess of $5,000,000 in profits each year from sales of Target's Kits.

33.  Since about 2004, Defendant Walgreens has marketed and sold ovulation test kits ("Walgreens's Kits").  During the relevant timeframe, Walgreens marketed and sold at least four different ovulation test kits: Ovulation + Pregnancy Kit, Digital Ovulation Predictor, Daily Ovulation Predictor, and One Step Ovulation Predictor.  Each of Walgreens's Kits prominently

bear the promise "OVER 99% ACCURATE" and are labeled as an "ovulation predictor" or "ovulation test."  For example, below is a photo of one of Walgreens's Kits:



34.    Walgreens's Kits are regularly sold at Walgreens stores and through Walgreens's website, walgreens.com.  Walgreens owns and operates over 9,000 stores in the United States.  Of those, Walgreens operates approximately 564 stores across the state of New York.

35.    Since approximately 2006, Defendant CVS has marketed and sold ovulation test kits ("CVS's Kits").  During the relevant timeframe, CVS has marketed and sold at least three different ovulation test kits: One Step Ovulation Predictor, Early Ovulation Kit, and Daily Ovulation Testing Strips.  Each of CVS's Kits prominently bear the promise "OVER 99%

ACCURATE" and are labeled as an "ovulation test."  For example, below is a photo of one of

CVS's Kits:



36.    CVS's Kits are regularly sold at CVS stores across the United States and directly

to consumers through CVS's website, cvs.com.  CVS has about 9,967 stores in the United States.

There are 65 CVS stores in New York City.

37.    In the United States, there are approximately 64.5 million women in the age range

15-44.  Just over 21 million of those women are 35-44.  According to the National Center for

Health Statistics, the provisional number of births for the United States in 2020 was 3,605,201,

down 4% from the number in 2019 (3,747,540).[4]

38.     Over the past few decades, the proportion of women bearing children later in life has increased significantly.  The birth rate for women in the age ranges 30-34, 35-39, and 40-44 has grown steadily since 1990, and the age range with the most births in 2019 was 30-34:



Figure 3. Birth rates, by selected age of mother: United States, 1990–2019

*National Vital Statistics Reports, Vol 70, No.2, Births: Final Data for 2019, March 23, 2021*
("2019 Birth Report")

39.     A woman's fertility declines as she ages.  Women above the age of 30 are more likely to have trouble getting pregnant:

---

4       *See* NVSS, Vital Statistics Rapid Release, Division of Vital Statistics, National Center for Health Statistics, May 2021, p.2 ("2020 Provisional Birth Report").

## Infertility

Percentage of married women 15-49 years of age who are infertile (i.e., who are not surgically sterile, and have had at least 12 consecutive months of unprotected sexual intercourse without becoming pregnant), by parity and age:

|  | 2015-2019 | |
|---|---|---|
|  | 0 births | 1 or more births |
|  | Percent (SE) | |
| Total 15-49 years | 19.4 (1.92) | 6.0 (0.64) |
| 15-29 years | 12.6 (3.01) | 5.1 (1.16) |
| 30-39 years | 22.1 (3.33) | 5.7 (0.88) |
| 40-49 years | 26.8 (4.50) | 6.5 (1.13) |

Source: Special tabulation by NCHS

https://www.cdc.gov/nchs/nsfg/key_statistics/i-keystat.htm#infertilityservices

40.     As of 2015, an estimated 7.3 million women had received some form of infertility service:

## Infertility services

|  | 2002[1] Percent, Number | 2006-2010[2] Percent, Number | 2011-2015[3] Percent (SE), Number |
|---|---|---|---|
| **Percentage and number of women 15-44 years of age who have ever received any infertility services** | 11.9% (7.3 million) | 11.9% (7.4 million) | 12.0% (0.51), 7.3 million |

Percentage of women 15-44 years of age who have ever received infertility services, by type of service:

|  | 2002[1] | 2006-2010[3] | 2011-2015[3] |
|---|---|---|---|
| **Advice** | 6.1% | 6.5% | 6.3% (0.38) |
| **Medical help to prevent miscarriage** | 5.5% | 4.9% | 5.4% (0.34) |
| **Tests on woman or man** | 4.8% | 5.1% | 5.2% (0.36) |
| **Ovulation drugs** | 3.8% | 4.0% | 4.2% (0.32) |
| **Artificial insemination** | 1.1% | 1.2% | 1.4% (0.19) |

(https://www.cdc.gov/nchs/nsfg/key_statistics/i.htm#infertilityservices).

41.     Women over 30, who now make up the majority of childbearing women in the United States, are more likely to need fertility assistance, including ovulation testing:

Percentage of women 15-49 years of age who have ever received any infertility service, by parity and age:

|  | 2015-2019 | |
| --- | --- | --- |
|  | 0 births | 1 or more births |
|  | Percent (SE) | |
| Total 15-49 years | 6.4 (0.53) | 16.6 (0.87) |
| 15-29 years | 2.7 (0.40) | 11.5 (1.49) |
| 30-39 years | 13.6 (1.89) | 15.5 (1.13) |
| 40-49 years | 21.8 (2.89) | 20.0 (1.54) |

Source: Special tabulation by NCHS

(https://www.cdc.gov/nchs/nsfg/key_statistics/i-keystat.htm#infertilityservices).

42.     In order to become pregnant, a couple must have intercourse within the window of time approximately between five days before and a few hours after ovulation. The highest probability of conception occurs when a couple has intercourse one or two days prior to ovulation. Therefore, especially for those couples who are having trouble getting pregnant, it is helpful to prospectively predict what day ovulation will occur each cycle.

43.     Defendants' Kits detect a rise in urinary LH levels. Over-the-counter LH tests like Defendants' Kits, designed for home use by the consumer, can be useful aids to help predict ovulation. When ovulation takes place, it is generally preceded by a surge in LH levels 24 to 36 hours beforehand. Other useful methods for timing intercourse include calendaring, measuring cervical mucus, and other hormone tests such as pregnanediol 3-glucuronide. However, neither LH tests nor any of these methods are able to identify, with 99% accuracy, if a woman is, or soon will be, ovulating. Currently the only method to predict ovulation with a high degree of accuracy is a transvaginal ultrasound, an invasive procedure performed in a clinical setting, which allows the doctor to actually view the egg growing and preparing to detach. An LH test, even if it is 99%

accurate in identifying LH, merely provides a "hint" at when ovulation will occur. Monitoring basal body temperature is another method that may provide clues when ovulation will occur. But a thermometer, which is 99% accurate at indicating body temperature, could not be marketed as a "99% accurate ovulation test kit."

44.     Defendants' Kits are not 99% accurate at predicting ovulation because the LH surge the tests detect is not always tied to the actual event of ovulation in a given menstrual cycle. LH surges may happen at other times in a woman's cycle. Many variables — including BMI, age, time from contraceptive use, sports activity, and smoking — affect the natural logarithm of urinary LH levels from days 7 to 20 of the cycle. If a test detects a different LH surge, not the surge that precedes actual ovulation, it will falsely predict the timing of ovulation for that cycle. The user of the test will then unknowingly miss the actual ovulation that takes place in that cycle, and the test will provide none of the fertility benefits for which it is marketed.

45.     Furthermore, many women do not have regular cycles. LH tests should be conducted at a specific time in the menstrual cycle, usually three to five days prior to expected ovulation. During irregular cycles, LH tests may be negative, falsely indicating that no ovulation occurred in that cycle. The common occurrence of irregular cycles thus further lower the chances that Defendants' Kits will accurately predict ovulation.

46.     Many women trying to get pregnant also have variations in their reproductive systems that make an LH surge not predictive of ovulation. For example, more than 10% of menstrual cycles of fertile women exhibit a condition known as "Luteinized Unruptured Follicle Syndrome." When this occurs, there is a normal LH surge and menstruation, but no egg is released. LH surge has also been detected in many women who are infertile.

47.     Therefore, a positive LH test does not predict, with 99% accuracy, that a woman

will ovulate within the next 24 to 36 or 24 to 48 hours, as claimed in Defendants' marketing.  While some of Defendants' Kits may have included an asterisk next to "99% ACCURATE," any attempt at a disclaimer was hidden in small text on a different part of the box or on a pamphlet inside the box.  The additional information provided in the small text, such as "*at detecting LH levels," would also not be understandable to a reasonable consumer, and certainly would not override the large, plain message on the front of the box that these were "OVULATION TESTS" with "99% ACCURACY."

48.     As a result of Defendants' misleading and deceptive marketing of "ovulation test kits," Plaintiffs and the Class purchased Defendants' Kits with the expectation that they were testing whether a woman is, or is about to be, ovulating, with an accuracy of 99%.

49.     Plaintiffs and the Class have been damaged by Defendants' misleading and deceptive practices.

## CLASS ACTION ALLEGATIONS

50.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the Class defined as follows:

> All persons who purchased Defendants' Kits within the state of New York for purposes other than resale.
>
> Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which the Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

51.     The Class is sufficiently numerous because Defendants' Kits are sold in thousands of stores, both in retail locations and online, and thousands of people have purchased them during the relevant period.  As a result, joinder of all Class members is impractical.

52.     There are questions of law and fact common to the Class and these questions

predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

- Whether Defendants labeled, packaged, marketed, advertised, and/or sold products using false, misleading, and/or deceptive packaging and labeling;

- Whether Defendants' actions constitute violations of misbranding laws in New York;

- Whether Defendants' actions constitute deceptive and unfair practices and/or violations of consumer protection laws in New York;

- Whether Defendants omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising, and/or selling of ovulation test kits;

- Whether Defendants' labeling, packaging, marketing, advertising, and/or selling of products constituted an unfair, unlawful, or fraudulent practice;

- Whether the members of the Class have sustained damages as a result of Defendants' wrongful conduct;

- Whether Defendants were unjustly enriched;

- The appropriate measure of damages and/or other relief; and

- Whether Defendants should be enjoined from continuing their unlawful practices.

53. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of consumer and class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature to represent them.  Plaintiffs anticipate no difficulty in the management of this litigation as

a class action.

54.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

55.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Because of the amount of the individual Class members' claims relative to the complexity of the litigation and the financial resources of the Defendants, few, if any, members of the Class would seek legal redress individually for the wrongs complained of here.  Absent a class action, Class members will continue to suffer damages and Defendants' misconduct will proceed without remedy.

## CAUSES OF ACTION

## COUNT I

### VIOLATIONS OF NEW YORK GBL § 349
### (AGAINST ALL DEFENDANTS)

56.     Plaintiffs, on behalf of themselves and the Class, incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.  Defendants violated N.Y. Gen. Bus. Law § 349 by engaging in unfair, misleading, deceptive, and/or unlawful acts and practices.

57.     Plaintiffs and the members of the Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).  Plaintiffs and the members of the Class are consumers.

58.     N.Y. Gen. Bus. Law § 349(a) makes unlawful deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State. Defendants engaged in business, trade, or commerce, or in the furnishing of service in New York.

59.     Defendants' conduct complained of herein consisted of deceptive acts and practices in the form of misrepresentations and omissions during conduct of business in New York in

violation of N.Y. Gen. Bus. Law § 349(a) as alleged herein, including, but not limited to, the marketing and sale of Defendants' Kits in misleading packages that falsely represented the nature, quality, and accuracy of the product.

60.     Defendants knew or should have known that their practices, as discussed herein, were misleading and likely to deceive and mislead Plaintiffs and the Class.

61.     Plaintiffs and the Class have been injured as a result of Defendants' violations of N.Y. Gen. Bus. Law § 349(a).

62.     Defendants' deceptive and misleading acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the Class.

63.     Plaintiffs are entitled to pursue claims against Defendants under N.Y. Gen. Bus. Law § 349(h) to redress Defendants' violations of N.Y. Gen. Bus. Law § 349(a).

## COUNT II

### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

64.     Plaintiffs, on behalf of themselves and the Class, incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

65.     As a result of Defendants' deceptive, fraudulent, and misleading labeling, packaging, advertising, marketing, and selling of Defendants' Kits, Defendants were enriched, at the expense of Plaintiffs and all others similarly situated, through the payment of the purchase prices for Defendants' Kits, and, on information and belief, revenue from licensing and other sources related to Defendants' Kits.

66.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs, and all others similarly situated, in light of the fact that the actual tests, which were purchased by Plaintiffs and

the Class, were not what Defendants purported them to be by their labeling and packaging.  Thus, it would be unjust or inequitable for Defendants to retain the benefit without restitution to Plaintiffs, and all others similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

(A)    An Order pursuant to Rule 23 of the Federal Rules of Civil Procedure certifying the Class, naming Plaintiffs as representatives of the Class, and appointing Plaintiffs' attorneys as Class Counsel to represent members of the Class;

(B)   An Order declaring that Defendants' conduct violates the statutes referenced herein and constitutes unjust enrichment;

(C)   An Order finding in favor of Plaintiffs and members of the Class;

(D)   Statutory damages pursuant to N.Y. Gen. Bus. Law § 349(a);

(E)    Compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(F)    Prejudgment interest on all amounts awarded;

(G)   An Order of restitution and all other forms of equitable monetary relief;

(H)   Injunctive relief to repackage and/or relabel Defendants' Kits as LH Test Kits as pleaded or as the Court may deem proper;

(I)    Injunctive relief to require Defendants to inform past purchasers of the inaccuracy of the 99% accuracy claim, which is warranted both for purchasers who have not yet used the tests they purchased, and also purchasers who have used the tests but were necessarily mislead about the significance of the test results.

(J)   An Order awarding Plaintiffs and members of the Class their reasonable attorneys' fees and expenses and costs of suit; and,

(K) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action so triable.

Respectfully submitted,

Dated: September 12, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:   /s/Daniella Quitt
    Daniella Quitt
    745 Fifth Avenue, 5th Floor
    New York, NY 10151
    Telephone: (212) 935-7400
    Email: dquitt@glancylaw.com

    -and-

    Peter A. Binkow
    Jonathan M. Rotter
    Natalie S. Pang
    1925 Century Park East, Suite 2100
    Los Angeles, CA 90067
    Telephone: (310) 201-9150
    Email: pbinkow@glancylaw.com

**UMBERG ZIPSER LLP**
Mark Finkelstein
Brent S. Colasurdo
1920 Main Street, Suite 750
Irvine, CA 92614
Telephone: (949) 679-0052
Email: mfinkelstein@umbergzipser.com

*Counsel for Plaintiffs and the Putative Class*