# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 22-CV-5435 (RER) (JRC)

———————————————

NATALIA LA ROSA, PHOEBE CANEDA, CATHERINE TIPLING, PRUSHTI DAVE, ALENE BERGUM, EMILY DEPOL, KEYA JOHNIGAN, BRIANNA MCKAY, AMIE ADAIR, STEPHANIE MORALES, and NICHELLE WHITE, on behalf of themselves and all others similarly situated

VERSUS

ABBOTT LABORATORIES, ALERE, PROCTER & GAMBLE MANUFACTURING COMPANY, SPD SWISS PRECISION DIAGNOSTICS GMBH, CHURCH & DWIGHT CO. INC., TARGET CORPORATION, CVS PHARMACY, INC., WALGREEN CO., and WALMART, INC.

———————————————

**MEMORANDUM & ORDER**

May 7, 2024

———————————————

**RAMÓN E. REYES, JR., U.S.D.J.:**

Eleven plaintiffs (the "Plaintiffs") brought this putative class action against nine defendants (the "Original Defendants") alleging violations of New York and California false advertising laws due to allegedly deceptively-labeled at-home ovulation test kits. (ECF No. 1). SPD Swiss Precision Diagnostics GMBH, Church & Dwight Co. Inc., Target Corporation, CVS Pharmacy, Inc., Walgreen Co., and Walmart, Inc. (collectively, "Defendants") now move to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 96 ("Defs.' Mot.")).[1] Plaintiffs oppose Defendants'

———————————————

[1] Defendants also move to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Defs.' Mot. at 1).

Motion. (ECF No. 99 ("Pls.' Opp.")). After carefully reviewing the record, and for the reasons set forth herein, Defendants' Motion is granted.

## **BACKGROUND**

I.      Factual Background[2]

Defendants SPD Swiss Precision Diagnostics GMBH and Church & Dwight Co. Inc. manufacture, market, distribute, and/or sell ovulation test kits under the names "Clearblue" and "First Response" respectively. (ECF No. 92 ("TAC") ¶¶ 40–41). Likewise, Defendants Target Corporation ("Target"), Walgreens Co. ("Walgreens"), CVS Pharmacy, Inc. ("CVS"), and Walmart, Inc. ("Walmart") manufacture, market, distribute, and/or sell their own branded ovulation test kits. (*Id.* ¶¶ 42–45).

Plaintiffs allege that Defendants deceive consumers by labeling their products "ovulation test kits" alongside the front-of-package statement "99% ACCURATE" because these statements together suggest that the tests are 99% accurate at testing for ovulation, when in fact, the products detect a surge in luteinizing hormone ("LH"), and not actual ovulation. (*Id.* ¶ 46). All the kits state in small writing on the side or back of the packaging that they are 99% accurate at detecting LH levels. (*Id.* ¶ 71). Some test kits include an asterisk next to the claim "99% ACCURATE" pointing toward this explanation. (*Id.*); *see*

---

[2] The facts alleged in the Third Amended Complaint are assumed true for the purposes of deciding Defendant's Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion to dismiss, "the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Alexandre v. Alcon Laboratories, Inc.*, No. 22 Civ. 8859 (PMH) (PED), 2024 WL 623707, at *2 (S.D.N.Y. Feb. 14, 2024) (quoting *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014) (summary order)). Here, the Plaintiffs provide images of the front of the test kits, while Defendants include images of the entire packaging. (*See* TAC ¶¶ 47–60; ECF No. 96-2, Exs. B–G). Therefore, because the entire context of the package is integral to the TAC, the Court also considers Defendants' exhibits B through G. These exhibits are annexed in the attached Appendix.

*also* Appendix. Others also include statements on the *front* of the packaging that they detect "LH Surge" or "No LH Surge." (*Id.* ¶¶ 47, 53, 55, and 59).

A consumer typically purchases one of Defendants' products to test for when they will ovulate so that they know the window for the highest probability of conception. (*Id.* ¶¶ 65–66). The kits detect a rise in urinary LH levels, which typically precedes ovulation by twenty-four to thirty-six hours. (*Id.* ¶ 67). LH surges, however, may occur at other times in a person's menstrual cycle. (*Id.* ¶ 68). Factors such as body mass index, age, contraceptive use, sports activity, and smoking may affect urinary LH levels. (*Id.*). Likewise, because the test kits should be used at a certain time during the menstrual cycle, when a person has an irregular cycle, the test could inaccurately indicate that no ovulation occurred. (*Id.* ¶ 69). Additionally, more than ten percent of menstrual cycles are subject to a condition known as "Luteinized Unruptured Follicle Syndrome," during which there is a normal LH surge and menstruation, but no egg releases. (*Id.* ¶ 70). LH surges may also be detected in women who are infertile. (*Id.*). Today, the only method for predicting ovulation with "a high degree of accuracy" is an invasive transvaginal ultrasound, which must be performed by a medical professional who can actually view the egg growing and preparing to detach. (*Id.* ¶ 67).

Between April 2021 and November 2021, Plaintiff Natalia La Rosa ("La Rosa") purchased Clearblue and First Response ovulation test kits, in addition to ovulation test kits by Target, Walgreens, and CVS, in Queens County, New York. (*Id.* ¶¶ 8–13). Between late 2018 and 2020, Plaintiff Phoebe Caneda ("Caneda") purchased Clearblue and First Response test kits in Queens County, New York. (*Id.* ¶¶ 15–16). In April or May 2023, Plaintiff Catherine Tipling ("Tipling") purchased Walmart's ovulation test kit. (*Id.* ¶¶

17–18). Plaintiffs La Rosa, Caneda, and Tipling (the "New York Plaintiffs") are all residents of New York state. (*Id.* ¶¶ 8, 15, 17).

Between December 2020 and January 2021, Plaintiff Prushti Dave ("Dave") purchased Clearblue ovulation test kits in Alameda County, California. (*Id.* ¶¶ 20–21). In April and December 2019, Plaintiff Arlene Bergum ("Bergum") purchased First Response ovulation test kits. (*Id.* ¶¶ 22–23). Between September and December 2020, Plaintiff Emily DePol ("DePol") purchased Target's ovulation test kits in Sacramento County, California. (*Id.* ¶¶ 24–25). In March 2021, Plaintiff Keya Johnigan ("Johnigan") purchased Walgreens' ovulation test kits in Los Angeles County, California. (*Id.* ¶¶ 26–27). In 2019, November 2020, and September 2021, Plaintiff Brianna McKay ("McKay") purchased Clearblue and First Response test kits, in addition to Walgreens' and Targets' test kits. (*Id.* ¶¶ 28–32). Throughout 2019 and at least once in 2020, Plaintiff Amie Adair ("Adair") purchased CVS' ovulation test kits. (*Id.* ¶¶ 33–34). Between 2016 and 2019, Plaintiff Stephanie Morales ("Morales") purchased Clearblue and Walmart's ovulation test kits in San Diego County, California. (*Id.* ¶¶ 35–36). Plaintiff Nichelle White ("White") purchased Clearblue, First Response, and CVS' ovulation test kits. (*Id.* ¶¶ 37–38). Plaintiffs Dave, Bergum, McKay, DePol, Johnigan, Adair, Morales, and White (the "California Plaintiffs") all are citizens of California state. (*Id.* ¶¶ 20–38).

The New York and California Plaintiffs bought Defendants' products with the expectation that they would test, with over 99% accuracy, whether they would ovulate in the next twenty-four to thirty-six hours. (*Id.* ¶¶ 8–38). Plaintiffs assert that because of the deceptive packaging, they were overcharged, did not receive the benefit of the bargain,

and/or suffered out-of-pocket losses. (*Id.*). Plaintiffs expect to continue to buy ovulation test kits from the respective brands which they previously purchased. (*Id.*).

The New York Plaintiffs bring claims for violations of New York General Business Law ("GBL") §§ 349 and 350 and for unjust enrichment. (*Id.* ¶¶ 86–98). The California Plaintiffs allege violations of the California Consumers Legal Remedies Act ("CLRA") § 1750, *et seq.*, Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, and the California False Advertising Law ("FAL"), California Business and Professions Code § 17500, *et seq.* (*Id.* ¶¶ 99–122). In addition to damages, Plaintiffs seek injunctive relief, requesting that the Court require Defendants to re-label their products "LH Test Kits" and to inform past purchasers of the inaccuracy of the "99% accurate" claim. (*Id.* at 34).

II.     Procedural History

On September 12, 2022, Plaintiffs La Rosa and Caneda filed a complaint for deceptive advertisement practices under New York law against the Original Defendants, except Walmart. (ECF No. 1). Simultaneously, Plaintiffs Dave, Bergum, DePol, Johnigan, and McKay sued for violations under California law against seven of the Original Defendants, also exclusive of Walmart. *See Dave, et al v. Abbott Labs., et al.*, No. 3:22-CV-5191 (JSC), ECF No. 1 (N.D. Cal. 2022). The California parties jointly moved to transfer their action to the Eastern District of New York. *Id.*, ECF No. 29. On January 25, 2023, Plaintiffs La Rosa and Caneda filed an unopposed motion to consolidate the two actions, which the Court granted. (ECF Nos. 61–62). Shortly thereafter, on February 7, 2023, Plaintiffs La Rosa and Caneda, along with the California Plaintiffs, submitted a

consolidated amended class action complaint against the Original Defendants. (ECF No. 63).

On March 14, 2023, Walmart sought to sever the claims against it and transfer venue back to the Southern District of California due to lack of personal jurisdiction. (ECF No. 68). Because Plaintiffs did not oppose Walmart's request (ECF No. 69), the Court granted the motion, severing and transferring the claims against Walmart to the Southern District of California. (First Order dated 4/26/2024). In addition, Defendants, except Walmart, sought to move to dismiss the complaint. (ECF No. 81). The Court granted leave to Plaintiffs to file an amended complaint to cure the alleged deficiencies Defendants identified. (Second Order dated 4/26/2023). Meanwhile, on March 24, 2023, Plaintiffs dismissed the action against defendants Abbott Laboratories, Alere Inc., and Procter & Gamble Manufacturing Company pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).[3] (ECF No. 76).

On May 10, 2023, Plaintiffs filed their second amended complaint against Defendants. (ECF No. 85). On June 8, 2023, Walmart consented to personal jurisdiction in this Court. (ECF No. 88). Plaintiffs then requested to amend the complaint again because an individual New Yorker who purchased Walmart's test kit sought to join the action. (ECF No. 89). The third amended complaint ("TAC") was filed on August 7, 2023. (*See* TAC).

Thereafter, Defendants moved to dismiss the TAC (Defs.' Mot.), which Plaintiffs opposed (Pls.' Opp.), and to which Defendants replied with further support. (ECF No. 97). In brief, Defendants argue that Plaintiffs fail to adequately allege that reasonable

---

[3] The notice of dismissal was never ordered by the Court. However, Plaintiff's subsequent amended complaints do not name Abbott Laboratories, Alere Inc., or Procter & Gamble Manufacturing Company.

consumers would be deceived by the products' labels. (ECF No. 96-1 ("Defs.' Mem.")).

On December 7, 2023, the action was reassigned to the undersigned. (Order dated

12/07/2023).[4]

## **DISCUSSION**

Defendants argue that the TAC should be dismissed because (1) Plaintiff's

"unreasonable" interpretation of the packaging is inconsistent with United States Food &

Drug Administration ("FDA") guidance on at-home ovulation test kits, (2) the products'

labels themselves dispel any potential deceptive advertising, and (3) a reasonable

consumer would not expect to buy a product that does not exist in the marketplace—an

at-home product that predicts actual ovulation.[5] (Defs.' Mem. at 4–17). Meanwhile,

Plaintiffs contend that the FDA guidance is not binding and instead, they have met their

burden by pleading that Defendants' test kits are deceptive to the reasonable consumer

and caused injury to Plaintiffs. (Pls.' Opp. at 3–22).

I.   Legal Standard

A.   Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, a complaint must contain "enough facts to state a claim to relief that is

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v.*

---

[4] The parties subsequently alerted the Court to affirmed, reversed, or new binding or supplemental authority: *Horti v. Nestle HealthCare Nutrition, Inc.*, No. 21-CV-9812 (PJH), 2022 WL 16748613 (N.D. Cal. Nov. 7, 2022), *rev'd*, 2023 WL 8613601 (9th Cir. 2023) (summary order); *Foster v. Whole Foods Mkt. Grp., Inc.*, No. 22-CV-1240 (ERK) (RML), 2023 WL 1766167 (E.D.N.Y. Feb. 3, 2023), *aff'd*, 2023 WL 8520270 (2d Cir. 2023); *Dorris v. Danone Waters of America*, No. 22 Civ. 8717 (NSR) (AEK), 2024 WL 112843 (S.D.N.Y. Jan. 10, 2024). (ECF No. 108). (ECF Nos. 106–09).

[5] Defendants also argue that Plaintiffs lack standing to pursue injunctive relief. "Since plaintiffs' claims all fail as a matter of law, the matter of injunctive standing need not be decided." *Warren v. Whole Foods Mkt. Grp., Inc.*, 574 F. Supp. 3d 102, 111 (E.D.N.Y. 2021) (collecting cases).

*Iqbal*, 556 U.S. 662, 697 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)). "Fact-specific question[s] cannot be resolved on the pleadings," *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

B.  Pleading Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When fraud is alleged, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Claims under GBL §§ 349 and 350 are "not subject to the pleading-with-particularity requirements of Rule 9(b)" and "need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Likewise, only when a plaintiff alleges that a defendant engaged in fraudulent conduct do claims under the CLRA, FAL, and UCL require Rule 9(b)'s pleading standard. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *In re Sony PS3 Other OS Litig.*, 551 F. App'x 916, 921 (9th Cir. 2014) ("Section 1770(a)(9) is the only subsection" of the CLRA "that

requires pleading fraud, since it specifically requires intent to defraud, which, in turn, implies knowledge of the falsity.") (quotation omitted).

II.   Plaintiffs Fail to State a Claim Under New York and California's Deceptive Advertising Statutes

New York law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. § 349(a). Likewise, "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is . . . unlawful." "False advertising" includes labeling. *Id.* § 350-a(1). "The elements of the plaintiffs' claims under these two sections of the [GBL] are the same." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 525 (E.D.N.Y. 2017) (citation omitted). To successfully assert a claim under either section, plaintiffs must allege that defendants engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."[6] *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quotation omitted).[7]

California law prohibits "unfair or deceptive acts or practices." CLRA § 1770. The UCL proscribes "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200. The FAL

---

[6] Plaintiffs undisputedly fulfilled the first element of their GBL claims. The sale of ovulation test kits is "consumer-oriented conduct." *See Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 95 (S.D.N.Y. 2021) (the first element is "liberally construed" and "may be satisfied by a showing that the conduct at issue potentially affect[s] similarly situated consumers") (quotations omitted); *see, e.g.*, *Orlander*, 803 F.3d at 300 ("There is no question that the sale of Staples Protection Plans constituted consumer-oriented conduct.") (quotation omitted).

[7] The Court notes that to have standing under these statutes, the plaintiff must have purchased the product in New York. To state a claim under GBL §§ 349 and 350, "the transaction in which the consumer is deceived must occur in New York." *Dorris*, 2024 WL 112843, at *3 (quotation omitted). This "territoriality requirement must be pleaded" for the claims to survive. *Id.* Here, Plaintiff Tipling has not alleged that she purchased a Walmart test kit in New York. (TAC ¶¶ 17–18). Because Plaintiff Tipling is the only New York Plaintiff to have purchased a Walmart product, the New York Plaintiffs lack standing to bring this action against Walmart.

prohibits "unfair, deceptive, untrue or misleading advertising." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ((quoting Cal. Bus. & Prof. Code § 17500) ("Any violation of the [FAL] . . . necessarily violates the [UCL].") (quotation omitted)). "Courts often analyze" the CLRA, UCL, and FAL "together because they share similar attributes." *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014) (collecting cases); *see Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009) (to state a claim under the CLRA, a plaintiff must establish that defendant made a material misrepresentation, on which they relied and because of which they suffered damages); *Sony PS3 Other OS Litig.*, 551 F. App'x at 921 ("[T]o state a claim under either the UCL or the [FAL], based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.") (quoting *Kasky v. Nike, Inc.,* 45 P.3d 243, 250 (Cal. 2002)).

When evaluating deceptive marketing claims under California and New York law, plaintiffs "must demonstrate [objectively] that a 'reasonable consumer' is likely to be misled by the representation." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021) (citing Ninth and Second Circuit cases); *see Orlander*, 802 F.3d at 300 ("the New York Court of Appeals has adopted an objective definition of misleading, under which the alleged act must by likely to mislead a reasonable consumer acting reasonably under the circumstances") (quotation omitted); *Bustamante v. KIND, LLC*, --- F.4th ----, 2024 WL 1917155, at *3 (2d Cir. May 2, 2024) (claims under New York GBL and the CLRA, FAL, and UCL governed under the same objective reasonable consumer test); *Moreno v. Vi-Jon, LLC*, No. 20-CV-1446 (JM) (BGS), 2023 WL 4611823, at *5 (S.D. Cal. July 18, 2023)

("Claims under the CLRA, FAL, and UCL are governed by the 'reasonable consumer test.'") (quoting *Williams*, 552 F.3d at 938).

A.   The Reasonable Consumer Standard

The reasonable consumer standard requires "a probability that a *significant* portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (quotation omitted) (emphasis added); *see also Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) ("[p]laintiffs must establish that [the] allegedly deceptive advertisements were likely to mislead a reasonable consumer acting reasonably under the circumstances"). The "issue may be a question of law or of fact as individual cases require." *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 (NGG) (RML), 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995)); *see also Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 576 (S.D.N.Y. 2021) ("And while such claims may be fact-intensive, a court retains the discretion in appropriate circumstances to conclude as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer.") (citing *Fink*, 714 F.3d at 741); *Culver v. Unilever United States, Inc.*, No. CV 19-9263-GW-RAOx, 2021 WL 10382839, at *5 (C.D. Cal. Jan. 21, 2021) (the Ninth Circuit's general rule is that "whether a business practice is deceptive will *usually* be a question of fact," but "usually" does not "connote never and there has been an ever-increasing number of cases (even at the Ninth Circuit) in which a motion to dismiss was found to be appropriately granted where the issue was whether a product label is (or

would be) deceptive or misleading to a reasonable consumer") (quotations omitted) (emphasis in original).

"[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink*, 714 F.3d at 742; *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1229 (9th Cir. 2019) (considering the term "diet" in the context of the entire product's label). Accordingly, when evaluating an advertisement, the court must "consider the challenged advertisement as a whole, including disclaimers and qualifying language." *Hardy v. Olé Mexican Foods, Inc.*, No. 22-1805, 2023 WL 3577867, at *3 (2d Cir. May 22, 2023) (summary order) (quotation omitted); *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (evaluating a label "in the context of its packaging").

Contextual inferences may be based on the product itself. *See Moore v. Trader Joe's Co.*, 4 F.4th 874, 883 (9th Cir. 2021) (affirming that the labeling of the product as "100% New Zealand Manuka Honey" was not deceptive in part due to the contextual inference that "making a honey that is 100% derived from one floral source" is impossible). Likewise, when statements on the side or back of the packaging confirms or clarifies front-of-label packaging, then any potential deception is dispelled. *See Foster v. Whole Foods Mkt. Grp., Inc.*, No. 23-285, 2023 WL 8520270, at *2 (2d Cir. Dec. 8, 2023) (summary order); *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) ("qualifiers in packaging . . . can ameliorate any tendency of the label to mislead") (quotation omitted).

  B.    A Reasonable Consumer Would Not Be
        Misled by Defendants' Packaging

Plaintiffs contend that they have sufficiently pleaded that Defendants' test kits are materially deceptive to the reasonable consumer because when read together, "ovulation

test" and "99% accurate" lead an objectively reasonable person to the understanding that the kits test for whether a person is ovulating with 99% accuracy, and anything to the contrary is a dispute of fact better left for summary judgment. (Pls.' Opp. at 5–6). This argument, however, forgoes evaluation of both the reasonable consumer of an at-home ovulation test kit and the entire product's packaging.

First, a key contextual inference arises from the products themselves: it is impossible to test for actual ovulation. A reasonable consumer does not expect to purchase a product that is impossible to find in the marketplace. *See Moore*, 4 F.4th at 883 ("A reasonable consumer would not understand [the defendant's] label here as promising something that is impossible to find."). In *Moore*, the Ninth Circuit considered the typical purchaser of the product in question, reasoning that while "consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items," including "low cost groceries," consumers of a "niche, specialty product are undoubtedly more likely to exhibit a higher standard of care." *Id.* at 884 (first quoting *Bell v. Publix Super Mkts. Inc.*, 982 F.3d 468 (7th Cir. 2020)). The FDA explains that at-home ovulation urine tests measure LH to detect ovulation and are successful at doing so "reliably about 9 times out of 10[.]"[8] This explains that tests that reveal actual ovulation do not exist. (TAC

---

[8] FDA, Ovulation (Urine Test), FDA (2/04/2028), https://www.fda.gov/medical-devices/home-use-tests/ovulation-urine-test. The FDA guidelines, however, are not determinative of a deceptive advertising claim. *Warren*, 574 F. Supp. 3d at 113.

Further, even though the test kits state "99% ACCURATE" on the front of their products, the FDA guidelines do not create a factual dispute about what the ovulation test kits can do or whether they are effective. *See, e.g., Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199 (MKB) (SMG), 2016 WL 5372794, at *10 (Sept. 26, 2016) ("Factual disputes about whether the studies actually prove that [the product] is ineffective, or whether there is a mere scientific debate regarding the benefits of [the product], cannot be resolved by the Court on a motion to dismiss."). While the FDA states that the ovulation test kits are effective at testing for ovulation about nine out of ten times, the products themselves state that their studies reveal 99% accuracy at testing for LH. *See* Appendix. Accordingly, the FDA guidance does not present a factual dispute, and Plaintiffs do not present any evidence that the 99% accuracy claims are, in fact, inaccurate.

¶ 67). Although a reasonable consumer is not expected to have medical expertise, in the context of a niche, specialty product, purchasers exhibit a higher degree of care. And indeed, Defendants' products are a specialty item targeted to a class of informed consumers to aid in their attempts to become pregnant. Many buyers of ovulation test kits have had trouble getting pregnant in the past, and as such, seek help from various sources. According to Plaintiffs, "[a]s of 2015, an estimated 7.3 million women had received some sort of infertility service[.]" (TAC ¶ 64). In turn, many ovulation test kit consumers would be expected to have at least some information leading up to their purchase, and therefore know what to expect to find in the marketplace—they do not expect to find at-home test kits that indicate actual ovulation.

Moreover, a reasonable purchaser of Defendants' products necessarily looks to the side and back of the box to understand how to use the products. Alongside these directions, the boxes for all the products in question clarify that the products test for LH, not for ovulation itself, and that an LH surge typically precedes ovulation. By contrast, a consumer of something such as a basic food item is not expected to flip over the packaging to look for clarification or disclaimers. *See Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 123 (S.D.N.Y. 2019) ("a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow, is not likely to study with great diligence the contents of a complicated product package, searching for and making sense of fine-print disclosures in asterisked footnotes, and looking for flavors other the one(s) s/he wishes to buy (which may or may not be on the shelf) in order to perform multiple mathematical calculations – all in order to confirm the truth or falsity of a claim that is of

dubious veracity"). Thus, a reasonable consumer of an ovulation test kit is likely to exhibit a higher degree of care.

Plaintiffs argue that the front label of Defendants' test kits "contain a statement that is unambiguously misleading" and cannot be saved by references to LH surges on the front of and/or clarifying language on the side or back of the packaging. (Pls.' Opp at 9–11). Read together, "Ovulation Test Kit" and "99% Accurate" could imply 99% accuracy at testing for ovulation, but the two phrases could also be read separately. Further, some products include phrases on the front like, "Predicts Your 2 Most Fertile Days" and "Early ovulation test . . . tells you the best 2 days to conceive." *See* Appendix. Plaintiffs are correct that when a front-of-label statement is unambiguous and clear, then consumers are not expected to look to other parts of the package for clarifying information. *See, e.g.*, *Mantikas v. Kellogg Co.*, 910 F.3d 633 (2d Cir. 2018) (affirming that plaintiffs sufficiently alleged that a reasonable consumer would be deceived by Cheez Its boxes when an unambiguous statement touted on the front of the box would lead one to believe that the crackers were "predominantly, if not entirely, *whole* grain" and consumers expect the ingredient list to confirm, not contradict, such a statement). But "[t]here is a spectrum of advertising claims from factual claims that are absolutely true, at the one end, to (moving along the spectrum) ambiguous claims, to misleading claims, to claims that are outright false — and everything in between." *Engram v. GSK Consumer Healthcare Holdings (US) Inc.*, No. 19-CV-2886 (EK) (PK), 2021 WL 4502439, at *4 (E.D.N.Y. Sept. 30, 2021).

In this instance, regardless of where the front package falls on the spectrum, the product requires a standard of care that necessitates looking at the complete package. *See Engram*, 2021 WL 4502439, at *5 ("it is not too much to expect a reasonable

consumer to review the directions on an SPF product for information on how often to reapply it"). When a consumer does read the side or back of Defendants' products to understand how to use them, as they are no doubt substantially likely to do here, they also read clear statements about how the products work, including explanations that the products are 99% accurate at testing for LH and how LH surges normally precede ovulation. Importantly, Plaintiffs do not point to any fact contradicting that the tests reliably predict ovulation, *i.e.*, the two best days to conceive. Even if on first blush a consumer is deceived into believing that a test kit tests for ovulation with 99% accuracy, the clarifying language on the side or back of the packaging dispels any confusion. *See Souter v. Edgewell Personal Care Co.*, No. 20-CV-1486 (TWR) (BLM), 2022 WL 48500, at *7–10 (S.D. Cal. Feb. 16, 2022) (rejecting plaintiff's allegations that antibacterial hand wipes had misleading representations when they stated that they "kill 99.99 percent of germs" because, looking at the product as whole, the "qualifying language on the back label" explaining which types of germs it kills "does not contradict the front label, rather confirms the product's proper use," curing any deception).

Further, the terms "ovulation" and "LH" are not ambiguous in and of themselves, and no claim on the packaging is unsupported. *See, e.g.*, *Dorris*, 2024 WL 112843, at *4–8 (defendant's water bottles labeled as "carbon neutral" were deceptive because the term carbon neutral is not easily defined, the reasonable consumer defines "carbon neutral" differently than the manufacturer, the Federal Trade Commission regulations advise against "unqualified general environmental benefit claims" due to the fact that they are confusing to the consumer, and the plaintiffs would have to research the standard-setting organization to understand what "carbon neutral" meant on this product). Finally, nothing

on Defendants' products is an affirmative misstatement—the two statements read together create at most an ambiguity, which is cured by the additional statements on the sides and back of the products. *See, e.g.*, *Horti*, 2023 WL 8613601, at *1–2 (9th Cir. 2023) (finding affirmative statements on a beverage that boasted blood sugar management and that it was "designed for people with diabetes," when in fact it only contained less sugar than other beverages, was deceptive to the reasonable consumer).

Therefore, Plaintiffs fail to sufficiently allege that a reasonable consumer of these products would be deceived, and Plaintiffs' claims for violations of GBL §§ 349 and 350, CLRA, UCL, FAL are dismissed.

III.    <u>The New York Plaintiffs Fail to State a Claim for Unjust Enrichment</u>

The New York Plaintiffs argue that they sufficiently plead their claim for unjust enrichment because they have alleged a "quasi-contract claim" wherein Defendants' deceptive acts caused Plaintiffs to "unjustly pay artificially inflated prices." (Pls.' Opp. at 26). "Under New York law, an unjust enrichment claim requires a showing: that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Coughlan v. Jachney*, 473 F. Supp. 3d 166, 204 (E.D.N.Y. 2020) (quotation omitted). The New York Court of Appeals cautions that the doctrine of unjust enrichment "is a narrow one; it is not a catchall cause of action to be used when others fail." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018) (quotation omitted). Although plaintiffs may plead unjust enrichment in the alternative, the claim fails "where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." *Engram*, 2021 WL 4502439, at *6–7 (quotation omitted) (dismissing plaintiffs'

unjust enrichment claims as duplicative of their deceptive advertising claims); *see also*

*Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012).

Here, the unjust enrichment claim is duplicative of the claims under the New York

consumer protection laws. The New York Plaintiffs allege that as a result of Defendants'

deceptive labeling, they were enriched by way of consumers' purchases, revenue from

licensing, and other sources related to the products. (TAC ¶ 97). These allegations are

the same conduct that underlies the New York Plaintiffs' statutory claims. (TAC ¶¶ 89, 91,

94); *see, e.g.*, *Greene v. Clean Rite Cleaners, LLC*, No. 22-CV-1750 (PKC) (RML), 2024

WL 328436, at *10–12 (E.D.N.Y. Jan. 29, 2024) (dismissing plaintiffs' allegations that

defendants were unjustly enriched due to "retaining the revenues derived from" plaintiffs'

purchases of the products as duplicative of the GBL claims). Therefore, the New York

Plaintiff's claims for unjust enrichment are duplicative and must be dismissed.

IV.     <u>Leave to Amend</u>

Plaintiffs request leave to amend, arguing that their previous amendments were

purely on procedural grounds. (Pls.' Opp. at 28–29). Leave to amend should be "freely"

given by courts "when justice so requires." Fed. R. Civ. P. 15(a)(2). "A plaintiff need not

be given leave to amend if it fails to specify," as the Plaintiffs do here, "how amendment

would cure the pleading deficiencies in the complaint." *TechnoMarine SA v. Giftports,*

*Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted). When a plaintiff's claims are

dismissed on substantive grounds, leave to amend is denied as futile because the

"substantive problem [cannot] be cured through better pleading." *Morales v. New York*

*City Dep't of Educ.*, 808 F. App'x 35, 38 (2d Cir. 2020) (summary order) (citing *Cuoco v.*

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)); *see, e.g.*, *Foster*, 2023 WL 1766167, at *5

(denying leave to amend as futile in a deceptive advertising case where plaintiffs failed to allege that the product's statements would mislead the reasonable consumer); *Harris v. Mondelēz Global LLC*, No. 19-CV-2249 (ERK) (RER), 2020 WL 4336390, at *3 (E.D.N.Y. July 28, 2020) (denying leave to amend when the challenged statement was not misleading to a reasonable consumer); *Melendez v. ONE Brands, LLC*, No. 18-CV-6650 (CBA) (SJB), 2020 WL 1283793, at *9 (E.D.N.Y. Mar. 16, 2020) (same). Accordingly, leave to amend is denied as futile.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss the Third Amended Complaint is GRANTED and the action is dismissed in its entirety. The Clerk of the Court is respectfully directed to terminate this action.

SO ORDERED.

Hon. Ramón E. Reyes, Jr.
Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2024.05.07 11:49:37 -04'00'

_____
RAMÓN E. REYES, JR.
United States District Judge

Dated: May 7, 2024
Brooklyn, NY